**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**MICHAEL WAGNER, LEVI INGERSOLL**
**KEN FENWICK and SIDNEY ALPAUGH,**

|  |  |
|---|---|
| **Plaintiffs,** | **1:09-cv-652** |
| | **(GLS/DRH)** |

        **v.**

**DAVID J. SWARTS et al.,**

        **Defendants.**

_____

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| **FOR THE PLAINTIFFS:** | |
| Proner, Proner Law Firm | MITCHELL L. PRONER, ESQ. |
| 60 East 42nd Street | |
| New York, New York 10165 | |
| | |
| **FOR THE DEFENDANTS:** | |
| HON. ERIC T. SCHNEIDERMAN | DOUGLAS J. GOGLIA |
| New York State Attorney General | Assistant Attorney General |
| Albany Office | |
| The Capitol | |
| Albany, NY 12224 | |

**Gary L. Sharpe**
**District Court Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiffs Michael Wagner, Levi Ingersoll, Ken Fenwick and Sidney

Alpaugh commenced this action against defendants,[1] asserting claims

pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of their constitutional

rights in conjunction with defendants' implementation and execution of

motorcycle checkpoints.  (*See* Compl., Dkt. No. 1.)  Pending are the

parties' cross-motions for summary judgment and plaintiffs' motion for class

certification.  (*See* Dkt. Nos. 61, 64.)  For the reasons that follow,

defendants' motion for summary judgment is granted, and plaintiffs'

motions are denied.

## II.  **Background**[2]

In 2008, the New York State Police implemented a Statewide

Motorcycle Enforcement and Education Initiative ("Initiative") to address the

"alarming increase in motorcycle crashes . . . over the past decade," and

the escalating "number of motorcycles traveling New York's roadways."

(Defs.' Statement of Material Facts ("SMF") ¶ 1, Dkt. No. 61, Attach. 1.)  In

addition to a public information/education element, the Initiative called for

---

[1] Although the Complaint lists multiple defendants, the parties, via stipulations, dismissed the claims against the majority of them.  (*See* Dkt. Nos. 44, 46, 47, 48, 49, 50.)  The remaining defendants are David J. Swarts, Chair of the Governor's Traffic Safety Committee, as well as Major William Sprague, Lieutenant Daniel Larkin and Lieutenant Jim Halversen, all of the New York State Police.

[2] The facts are undisputed unless otherwise noted.

2

motorcycle checkpoints, "a novel concept in New York as well as nationally," to reduce the number of motorcycle crashes and increase vehicle and traffic law compliance.  (*See id.* ¶¶ 2-4.)  According to defendants,[3] the primary objective of the checkpoints was "to detect motorcycle safety violations and insure [*sic*] proper registration and operator compliance with New York State's motorcycle license requirements."  (*See, e.g, id.* ¶ 6.)[4]

   1.   *Creation of the Initiative*

   As part of his Master's course work at the State University of New York at Albany, defendant Lt. James Halversen, the commanding officer of the New York State Police Motorcycle Unit, wrote a thesis on the increasing rate of motorcycle fatalities for riders over forty-years old.  (*See* Dkt. No. 61, Attach. 14 ¶ 25.)  In so doing, he considered measures—such as routine commercial trucking inspections and the automobile seatbelt

---

   [3]  Plaintiffs aver defendants' stated objective is merely a pretext, as the true purpose of the checkpoints was general criminal interdiction.  (*See* Dkt. No. 64, Attach. 3 ¶ 1.)  In support of this contention, they raise two principle arguments: (1) the checkpoints were ineffective since they failed to address the major causes of motorcycle fatalities (*i.e.,* speed and alcohol) and were not explicitly recommended by either the National Highway Traffic Safety Administration ("NHTSA") or the Governor's Traffic Safety Committee ("GTSC"); and (2) the inclusion of non-motorcycle enforcement officers at the checkpoints was indicative of the true purpose.  (*See id.*; *accord* Dkt. No. 64, Attach. 11 at 7-8.)

   [4]  (*See also* Dkt. No. 61, Attach. 14 ¶ 6, Attach. 22 at 31, Attach. 23 at 31, Attach. 26 at 1, Attach. 27 at 3, Attach. 28 at 1.)

checkpoints—that the State Police could adopt to "curb the increase in all motorcycle crashes and fatalities" in New York.  (*Id.* ¶ 26.)  Based on his research,[5] and his experience as a "motorcycle enthusiast," Halversen developed the idea for motorcycle safety checkpoints.  (*Id.* ¶¶ 25-27.) Upon his return to duty, he set out to implement this plan.  (*Id.*)

With the help of defendant Lt. Daniel Larkin, Halversen submitted a grant application to the GTSC in 2007 to fund the checkpoints.  (Pls.' SMF ¶¶ 84, 88, Dkt. No. 64, Attach. 4.)  The GTSC, which is chaired by defendant David J. Swarts, approved the application and funded the Initiative with federal grant money "provided by NHTSA and [Federal Highway Administration ("FHA")]."  (Dkt. No. 61, Attach. 3 ¶¶ 5-6.) Although Swarts oversaw the funding of the Initiative, neither he, nor any

---

[5] In his affidavit, Halversen recited numerous statistics on motorcycle safety trends to explain "why it became necessary for law enforcement authorities to increase the attention paid to motorcyclists and motorcycle safety issues." (Dkt. No. 61, Attach. 14 ¶ 8.)  For example, in October 2007, the Department of Transportation noted a "pronounced trend" in motorcycle fatalities during the preceding nine years. (Defs.' SMF ¶ 10.)  Although motorcycles comprise less than 3% of the registered vehicles in the United States, motorcyclists were approximately "37 times more likely than passenger car occupants to die in a [crash] and 9 times more likely to be injured."  (*Id.* ¶ 11.)

Notably, in New York, motorcycle fatalities increased by 23% between 2004 and 2009, and the total number of motorcycle "crashes" increased by 27% from 2003 to 2007.  (*Id.* ¶¶ 11, 14.)  With respect to motorcycle helmets—which "are estimated to be 37-percent effective in preventing fatal injuries to motorcycle [drivers] and 41-percent for motorcycle passengers"—New York, despite its mandatory helmet law, *see* N.Y. Veh. & Traf. Law § 381(6) (McKinney 2005), saw an increase from 13% to 20% in motorcycles fatalities "accounted for by unhelmeted riders."  (Defs.' SMF ¶ 10.)

member of the GTSC staff, participated in any of the checkpoints.  (*Id.* ¶¶ 7-8.)

The pilot checkpoint was conducted on I-84 in Duchess County on October 7, 2007, the same day a "large motorcycle event was being held 20 miles to the east," in Connecticut.  (Defs.' SMF ¶¶ 46-48.)  Portable highway message signs instructed all motorcycle riders to "exit ahead," and a marked state police vehicle, with its emergency lights on, was stationed at the entrance to the rest area; a trooper standing outside the vehicle waved "all oncoming motorcycles into the rest area."  (*Id.* ¶¶ 49-51.)  Once inside, the motorcyclists were directed to an inspection area where members of the Motorcycle Unit inspected both the bikes and the riders.  (*Id.* ¶ 52.)  Violations were noted on a checklist and then passed to a State Police Trooper, who in turn issued any applicable traffic citations.  (*Id.* ¶ 53.)  In total, 280 motorcycles passed through the pilot checkpoint, 225 were inspected for safety violations, and 104 traffic tickets were issued, of which illegal helmets was the most common with 41 infractions.  (*Id.* ¶ 55.)

### 2.   *The Motorcycle Checkpoints*

Halversen's initial plan ("Plan 1") called for "full-blown inspections" of every motorcycle that entered the checkpoint.  (*See* Dkt. No. 64, Attach. 3

5

¶ 56.)  This plan, which mirrored the configuration of the pilot checkpoint,

was memorialized in the New York State Police 2008 Guidelines for the

Operation of Motorcycle Enforcement Checkpoints.  (Defs.' SMF ¶¶ 56-57;

*see also* Dkt. No. 61, Attach. 26.)  These guidelines outlined the planning

and execution of the motorcycle checkpoints, including: location and date

selection[6]; discussion points for pre-checkpoint briefings; safety

considerations[7]; and even how to distinguish illegal "novelty" helmets from

Department of Transportation ("DOT") compliant helmets[8].  (*See* Defs.'

_____

[6] Defendants admit that to justify the resources expended, the motorcycle checkpoints were executed on days, and in locations, that corresponded with "a sufficient volume of motorcycle traffic."  (Defs.' SMF ¶ 58.)  To this end, the 2008 Guidelines state: "[u]nless an area has an abnormally high volume of motorcycle traffic absent some specific event, or groups are known to engage in illegal stunt riding activities on specific public highways, checkpoints should be scheduled contemporaneous with some event that brings a sufficient volume of motorcycle traffic through the checkpoint area."  (*Id.*)

[7] Although Plan 1 called for the stop of every motorcycle entering the checkpoint, checkpoint personnel were "reminded that 'checkpoints must be conducted in the safest manner possible,'" even if that meant that some motorcycles were allowed to pass through without inspection.  (Defs.' SMF ¶ 61.)  In fact, the 2008 Guidelines state:

> [B]revity . . . must be emphasized. Unless a violation of law is observed or suspected, each inspection MUST be brief, taking no more time than is necessary to walk around the motorcycle, observe relevant safety equipment (including helmet) and check for a proper driver's license. Traffic CANNOT be allowed to back up into a queue waiting for an inspection.

(*Id.* ¶ 62) (emphasis in original).  To ensure safe operations, the checkpoint's commanding officer was vested with the authority to wave "all oncoming motorcycles . . . passed the checkpoint until the congestion abated and it again became possible for checkpoint personnel to safely and expeditiously conduct inspections."  (*Id.* ¶¶ 63-64.)

[8] The defendants provided a substantial amount of documentation on the distinction between DOT compliant helmets and novelty, or non-DOT compliant, helmets.  (*See* Defs.' SMF ¶¶ 19-45.)  Indeed, checkpoint personnel were instructed to "take a zero-tolerance approach" when it came to ticketing "substandard helmets," which according to the defendants were easily identifiable.  (*See id.* ¶ 40, 65.)

SMF ¶¶ 58-66; *see also* Dkt. No. 61, Attach. 26.)  However, Plan 1 was short-lived as the troopers conducting the initial checkpoints were "overwhelmed," and a "significant number of motorcycles were waved past . . . to avoid traffic backups and concomitant safety concerns."  (Defs.' SMF ¶ 67.)

In its place, the State Police "adopted a second methodology" ("Plan 2"), which enabled them to conduct checkpoints "where heavy volumes of traffic were anticipated."  (*Id.* ¶ 68.)  The major difference between Plans 1 and 2 was that Plan 2 utilized an officer at the "point"— the entrance of the checkpoint—who was responsible for quickly screening each passing motorcyclist for helmet compliance, and each motorcycle for obvious equipment violations.  (*Id.* ¶ 70.)  Halversen explained the "point" process as follows:

> If a violation was observed, or there was reasonable cause for the point officer to suspect a violation, the motorcyclist was directed into the inspection area for a thorough inspection. Conversely, if no apparent or probable violation[9] was observed, the motorcyclist was waved past the checkpoint and back onto the highway without stopping, and in most cases, without having to put his or her foot on the pavement.

---

[9] The actual language contained in the plan is not "probable violations," it is "visual or audible violations."  (*See* Dkt. No. 61, Attach. 28 at 6.)

(*See* Dkt. No. 61, Attach. 14 ¶ 37.)  Although incorporated into the 2009 New York State Police Guidelines for the Operation of Motorcycle Enforcement Checkpoints, plaintiffs dispute that Plan 2 was used at the checkpoints at which they were stopped.  (*See* Defs.' SMF ¶¶ 71-73; Dkt. No. 64, Attach. 3 ¶¶ 71-72.)

In sum, 17 motorcycle checkpoints were conducted in 2008; 5,342 vehicles passed "through the check," 2,278 were inspected and 1,064 tickets were issued.  (Pls.' SMF ¶¶ 140, 145-46.)  Of the 1,064 tickets issued, 600 were for non-safety related violations, 365 were for helmet violations and 99 were for other safety violations.  (*Id.*)  The checkpoints also resulted in 4 criminal arrests.  (*Id.*)  Moreover, the Initiative "significantly increased the number of tickets issued for illegal helmets" from 35 in 2007 to 796 in 2008, a 2,175% increase, and further contributed to a 17% decrease in motorcycle fatalities from 2008 to 2009.  (Defs.' SMF ¶¶ 141-42.)

With respect to the checkpoints plaintiffs encountered on June 13 and June 20, 2008, 1,319 motorcycles were screened by the point, resulting in 171 illegal helmet citations, 17 illegal exhaust citations, 24 citations for "other safety-related VTL violations" and 56 citations for "other

VTL violations." (*See id.* ¶¶ 143, 145.)

    *3.    The Underlying Motorcycle Stops*

    On June 13, 2008, plaintiff Sidney Alpaugh departed his

Pennsylvania home on his motorcycle for Port Dover, Canada, to attend

the Friday the Thirteenth motorcycle rally. (Pls.' SMF ¶ 10-11.) En route,

he encountered a motorcycle checkpoint which was set up on an exit ramp

off I-190 near the Peace Bridge Point of Entry. (*Id.* ¶ 15; Defs.' SMF ¶ 84.)

As he drove down the exit ramp, Alpaugh noticed that "all motorcycles

were being directed to the right while all cars and trucks were being

permitted to proceed." (Pls.' SMF ¶ 15.) When he "approached an officer

standing in the middle of the road," the officer directed him into the

inspection area that was staged in an adjoining park. (Pls.' SMF ¶ 16;

Defs.' SMF ¶¶ 85-87.) Once inside the inspection area, which was

surrounded by police cars and officers equipped with "riot gear," Alpaugh

was instructed to dismount and remove his helmet. (Pls.' SMF ¶ 17; Defs.'

SMF ¶ 87.) A trooper took his insurance, registration and license back to a

patrol car for processing, and when the trooper returned, Alpaugh was

issued a ticket for wearing an unapproved helmet. (Defs.' SMF ¶¶ 88-89.)

Although he now claims that he was detained for 45 minutes, and that he

only pled to the helmet infraction to save money, Alpaugh initially claimed the stop lasted 20-30 minutes.  (Pls.' SMF ¶¶ 20, 28; Defs.' SMF ¶ 91.)

Like Alpaugh, plaintiffs Levi Ingersoll, Ken Fenwick and Michael Wagner were also stopped at a motorcycle checkpoint, albeit one week later on June 20, 2008, in conjunction with their trips to the "Harley Rendezvous."  (*See* Defs.' SMF ¶¶ 93-122.)  All three admitted they saw a sign which read "All Motorcycles Exit"; that they were directed into the inspection area by an officer standing in the middle of the road; and each was eventually ticketed for—and plead guilty to—wearing an unlawful helmet.  (*See id.*)  Moreover, Ingersoll and Fenwick both stated they were detained for no more than 30 minutes at the checkpoint.  (*See* Defs.' SMF ¶¶ 98, 112.)

As a result of being stopped at the motorcycle checkpoints, plaintiffs now seek both compensatory and punitive damages, declarative and injunctive relief, and an award of costs and attorney's fees, for alleged violations of their constitutional rights.  (*See* Compl. ¶ 1, Dkt. No.1.)

### III.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). When evaluating the material facts, the court "construes all evidence in the light most favorable to the non-moving party, drawing all inferences and resolving all ambiguities in [its] favor." *Amore v. Novarro*, 624 F.3d 522, 529 (2d Cir. 2010). Thus, the movant must demonstrate the absence of genuine issues of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999), a burden it can meet "if [it] can point to an absence of evidence to support an essential element of the nonmoving party's claim," *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).

If the movant satisfies its burden, the nonmoving party must offer specific evidence showing that a genuine issue of material fact warrants a trial. *See Celotex*, 477 U.S. at 324. "A 'genuine' dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988) (citation omitted). Moreover, material disputes must be based on specific facts as reflected in the adverse party's

response, by affidavits or as otherwise authorized by Rule 56, *see St. Pierre v. Dyer*, 208 F.3d 394, 404 (2d Cir. 2000), and affidavits must be based on personal knowledge, *see Harriscom Svenska, AB v. Harris Corp.*, 3 F.3d 576, 581 (2d Cir. 1993). The bald assertion of some alleged factual dispute will not defeat a properly supported motion. *See Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994) (citation omitted). "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). Naturally, reasonable inferences may defeat a summary judgment motion, but only when they are supported by affirmative facts and relevant, admissible evidence. *See* Fed. R. Civ. P. 56(c)(4); *Spinelli v. City of New York*, 579 F.3d 160, 166-67 (2d Cir. 2009). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

## IV.  Discussion

It is axiomatic that the motorcycle checkpoints here constitute seizures "within the meaning of the Fourth Amendment." *See City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2004). However, merely

12

implicating the Fourth Amendment is insufficient as only unreasonable seizures run afoul of it.  *See, e.g., Ill. v. Lidster*, 540 U.S. 419, 426 (2004). While the constitutionality of the motorcycle checkpoints is directly tied to their reasonableness, the court, in resolving the pending motions, is not similarly bound.

Here, defendants, in addition to arguing that the motorcycle checkpoints were constitutionally permissible, also assert the following defenses: sovereign immunity, a lack of personal involvement, and qualified immunity.  Collectively, these defenses, if meritorious, negate the need to address the overarching constitutional issue.  But, given the breadth and importance of the motorcycle checkpoints, abstention on the principal issue would simply be unjust. Therefore, before discussing the alternative defenses raised, the court addresses the constitutionality of the motorcycle checkpoints.

## A.    Fourth Amendment "Special Needs" Doctrine

The crux of defendants' argument is that the motorcycle checkpoints, as executed by the New York State Police, are constitutionally permissible because "the primary objective . . . was, and is, to target safety violations." (*See* Dkt. No. 61, Attach. 2 at 30-31.)  Conversely, plaintiffs claim the

13

stated purpose of "safety" is a pretext, relying primarily on the presence of

non-motorcycle unit officers at the checkpoints to support their position.

(*See* Dkt. No. 64, Attach. 1 at 27-32; Dkt. No. 70 at 3-4.)  They further aver

that even if the purpose of the checkpoints was permissible, "the severity of

the checkpoints' interference with the personal liberty of motorcyclists far

outweighs the degree to which the seizure actually serves the public

interest in reducing motorcycle accidents and fatalities."  (*See* Dkt. No. 64,

Attach. 1 at 37.)  The court will address each of these arguments in turn.

### 1.    *The Primary Purpose of the Checkpoints*

Generally, a search or seizure conducted without the "individualized

suspicion of wrongdoing" is unreasonable under the Fourth Amendment.

*Edmond*, 531 U.S. at 37.  However, this general rule is not without

exceptions, one of which—the "special needs" doctrine—is applicable in

this case.  Under this doctrine, programs "designed to serve 'special needs,

beyond the normal need for law enforcement,'" are sustainable in absence

of individualized suspicion. *See id.*  However, where the primary purpose of

the program is "a general interest in crime control," it is disqualified from

"special needs" treatment.  *Lynch v. City of New York*, 589 F.3d 94, 100

(2d Cir. 2009), *cert. denied*, 131 S. Ct. 415 (2010) (citing *Edmond*, 531

14

U.S. at 38) (internal quotations omitted).  Accordingly, the threshold inquiry examines the "programmatic purpose," as "special needs" analysis is only appropriate in cases where the government's principal interest is distinct from general crime control.  *Lynch*, 589 F.3d at 100 (citing *Edmond*, 531 U.S. at 45-46).

Vehicle checkpoints, such as the ones at issue here, are not a novel concept.  Indeed, the Supreme Court has repeatedly affirmed their constitutionality in a variety of contexts. *See, e.g., United States v. Martinez-Fuerte*, 428 U.S. 543 (1976) (to intercept illegal aliens at a fixed Border Patrol checkpoint); *Mich. Dept. of State Police v. Sitz*, 496 U.S. 444 (1990) (at sobriety checkpoints); *Lidster*, 540 U.S. at 423-28 (for the purpose of locating witnesses to a hit-and-run); *but see Edmond*, 531 U.S. at 44 (refusing to "sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime").  Furthermore, several Circuit Courts have upheld checkpoints regulating vehicular traffic, a purpose less distinguishable from general crime control.  *United States v. Bowman*, 496 F.3d 685, 692 (4th Cir. 2007) ("[A] roadblock is constitutionally permissible where its principal purpose is to regulate

15

vehicular traffic by allowing police to check driver's licenses and vehicle registrations.") (internal citations and quotations omitted); *accord United States v. Fraire*, 575 F.3d 929, 932-35 (9th Cir. 2009); *United States v. Galindo-Gonzales*, 142 F.3d 1217, 1221 (10th Cir. 1998); *United States v. McFayden*, 865 F.2d 1306, 1310-13 (D.C. Cir. 1989).

Here, the court concurs with defendants that the principal focus of the motorcycle checkpoints was safety.  In addition to the empirical evidence provided, the exhibits submitted in support of defendants' motion consistently state the checkpoints were designed "to detect motorcycle safety violations and insure [*sic*] proper registration and operator compliance with New York State's motorcycle license requirements." (Defs.' SMF  6; Dkt. No. 61, Attach. 14  6, Attach. 22 at 31, Attach. 23 at 31, Attach. 26 at 1, Attach. 27 at 3, Attach. 28 at 1); *but see Bowman*, 496 F.3d at 693-695 (finding the testimony of a single field officer, standing alone, was insufficient to prove the primary purpose of the roadblocks in question).  Albeit less refined than sobriety checkpoints, the purpose of the motorcycle checkpoints is easily discernible from a general interest in crime control.

Rather than conceding this point, plaintiffs allege that a factual

dispute exists as to the primary purpose of the checkpoints.  (See Dkt. No. 70 at 3-4.)  Their argument rests on the following "undisputed" facts: (1) the checkpoints were not explicitly "recommended as a means of promoting motorcycle safety" by the NHTSA; (2) the checkpoints failure to "address" speed and alcohol; (3) defendants' view that select segments of the motorcycling community who attend the events targeted consist of "outlaw bikers" and "dangerous gang members"; (4) the monitoring of the checkpoints by the New York State Police Special Investigation Unit ("SIU") and gang task force for the purposes of "criminal interdiction"; (5) the recommendation that checkpoints include SIU officers to "conduct a more thorough inspection of any suspect motorcycle, particularly as it relates" to non-traffic offenses; and (6) a GTSC progress report which states the "motorcycle grant includes funding for overtime for intelligence gathering and subsequent criminal and traffic enforcement resulting from this effort." (See Dkt. No. 64, Attach. 1 at 32-33; Dkt. No. 70, Attach. 2 at 2.)  While these facts may be undisputed, they are unequivocally immaterial.

First, the fact that other law enforcement personnel were on hand, and focused on non-safety violations does not render the checkpoints

unconstitutional.[10]  Although *Edmond* explicitly left open the question of "whether police may expand the scope of a license or sobriety checkpoint seizure in order to detect the presence of [other crimes]," 531 U.S. at 47 n.2, the Second Circuit, in *Lynch*, directly addressed this point.  There, the Court stated: "[T]he special needs doctrine applies to any program of searches whose "primary purpose" is a government interest other than crime control, *Edmond*, 531 U.S. at 46-48, and the mere fact that crime control is *one* purpose—but not the *primary* purpose—of a program of searches does not bar the application of the special needs doctrine." *Lynch*, 589 F.3d at 102 (emphasis in original); *see also United States v. William*, 603 F.3d 66, 68 (1st Cir. 2010) (finding that even though the police were primarily conducting a sobriety checkpoint, the fact that "other crimes might come to light" was sufficient to warrant keeping a drug-sniffing dog in reserve); *cf. Ill. v. Caballes*, 543 U.S. 405, 407-08 (2005) (A dog sniff, which does not extend the duration of an otherwise lawful traffic stop,

---

[10]  The degree to which SUI participated in, and the number of arrests during, the checkpoints further diminishes plaintiffs' argument regarding the primary purpose of the checkpoints.  Though it is clear that SUI officers "monitored" the checkpoints, (*see, e.g.,* Dkt. No. 61, Attach. 4 ¶ 4), plaintiffs have not demonstrated that SUI took part in any of the inspections, or even interacted with any of the motorcyclists. (*See* Dkt. No. 64, Attach. 1 at 15, 33; Dkt. No. 64, Attach. 4 ¶¶ 109-11.)  Moreover, the 17 checkpoints in 2008 only resulted in 4 criminal arrests.  (Pls.' SMF ¶¶ 140, 145-46.)  Stated another way, of the 2,278 inspections conducted, 0.17% resulted in an arrest.  (*Id.*)

neither shifts the purpose of the stop, nor renders it unconstitutional.).

Essentially, plaintiffs seek to prohibit officers conducting a lawful checkpoint from investigating evidence of general criminal wrongdoing, which if observed during a roving traffic stop, would otherwise be pursued. Notably, such a rule could deter law enforcement officials from properly allocating resources—*e.g.,* personnel trained and equipped to handle volatile gangs—out of fear that the mere presence of such equipment or personnel would render the entire operation unconstitutional. Besides being unsupported by controlling precedent, this argument is alarming and incongruous.

Second, the fact that the NHTSA did not recommend the checkpoints is equally unpersuasive. "[T]he decision as to which among reasonable alternative law enforcement techniques" to employ is a decision for those "who have a unique understanding of, and a responsibility for, limited public resources," and not the court. *Sitz*, 496 U.S. at 453.

Finally, plaintiffs' argument regarding the checkpoints' failure to address the problems of alcohol and speed is baffling given their position in this litigation. By arguing that the checkpoints are ineffective in addressing the dangers caused by alcohol, plaintiffs not only ignore Larkin's testimony

19

on intoxicated motorcyclists,[11] but also implicitly concede that the checkpoints would be constitutional if their primary purpose was sobriety. Likewise, as defendants aptly note, using a checkpoint to combat speeding is illogical as the motorcyclists are required to slow down to a speed of roughly 5 m.p.h. to pass through them.  (*See* Dkt. No. 66 at 6.)

Despite plaintiffs' attempt to cast doubt on the primary purpose of the checkpoints, the evidence submitted demonstrates that the focus of the checkpoints was safety, not crime control.  As such, the checkpoints are not *per se* unconstitutional under *Edmond* since their primary purpose was distinct from the general interest in crime control.  *See* 531 U.S. at 44.

### 2.    *The Balancing Test*

Because the checkpoints implicate a "special need," their reasonableness must now be evaluated "on the basis of the individual circumstances."  *Fraire*, 575 F.3d at 932 (quoting *Lidster*, 540 U.S. at 426) (internal quotations omitted); *see also United States v. Amerson*, 483 F.3d 73, 83 (2d Cir. 2007) (describing the second inquiry in the "special needs" analysis as "context-specific").  This evaluation, which is essentially a

---

[11]  Larkin testified that in spite of the fact that these were not sobriety checkpoints, "whenever [the State Police] stop a vehicle, if [they] detect alcohol impairment, [they] would administer . . . a breath test."  (*See* Dkt. No. 61, Attach. 8 at 27:24-29:2.)

balancing test, considers "the gravity of the public concerns served by the

seizure, the degree to which the seizure advances the public interest, and

the severity of the interference with individual liberty." *Lidster*, 540 U.S. at

427 (quoting *Brown v. Tex.*, 443 U.S. 47, 51 (1979)).

>           a.      The gravity of the public concern

Defendants argue that mitigating "an alarming increase in motorcycle

crashes and fatalities by detecting motorcycle safety violations" is a

sufficiently grave interest. (*See* Dkt. No. 61, Attach. 2 at 33.) Conversely,

plaintiffs endeavor to downplay the seriousness of the problem by arguing

the threat posed by motorcycle accidents and fatalities is not "immediate,"

and that even if it is, the existence of "practical alternatives" to the

checkpoints renders them impermissible. (*See* Dkt. No. 64, Attach. 1 at

41.) Again, plaintiffs' argument lacks merit.

In *Delaware v. Prouse*, the Supreme Court reviewed, and ultimately

struck down, a discretionary license and registration spot check by a roving

patrol officer. 440 U.S. 648, 663 (1979). Notwithstanding its decision,

which largely rested on the complete lack of empirical support for the

State's position, the Court agreed "that the States have a vital interest in

ensuring that only those qualified to do so are permitted to operate motor

vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed." *Id.* at 658.

Here, unlike in *Prouse*, 440 U.S. at 658, defendants submitted statistics to substantiate their assessment of the motorcycle safety problem.[12]  For example, in October 2007, the DOT noted a "pronounced trend" in motorcycle fatalities during the preceding nine years.  (Defs.' SMF ¶ 10.)  In New York alone, motorcycle fatalities increased by 23% between 2004 and 2009, and the total number of motorcycle "crashes" increased by 27% from 2003 to 2007.  (*Id.* ¶¶ 11, 14.)

While plaintiffs may disagree with Halversen's research, and the collective expertise of the New York State Police and GTSC, they have not, and arguably could not, refute New York's interest in ensuring that motorcycles traveling on its roads are "fit for safe operation."  *See Prouse*, 440 U.S. at 658.  As such, the court concludes that regulating motorcycle safety is a sufficiently grave public interest to support the seizures in question.

        b.     <u>The interests advanced by the checkpoints</u>

---

[12]  *See* Part II *supra* note 5.

The second factor to analyze is the "degree to which the seizure advances the public interest." *Lidster*, 540 U.S. at 427 (quoting *Brown v. Tex.*, 443 U.S. at 51).  Here, the evidence establishes the checkpoints had an immediate impact on motorcycle safety.  Specifically, "the number of tickets issued for illegal helmets" increased from 35 in 2007 to 796 in 2008, a 2,175% increase, and motorcycle fatalities decreased by 17% from 2008 to 2009.  (Defs.' SMF ¶¶ 141-42.)  In fact, 356, or 45%, of the 796 tickets for illegal helmets were issued at the checkpoints.  (*See* Pls.' SMF ¶¶ 140, 145-46.)  In addition to these results, the "checkpoints likely have a deterrent value apart from" the safety violations cited during the stops.  *See William*, 603 F.3d at 70.  Accordingly, the checkpoints undeniably advanced the public interest in promoting motorcycle safety.

### c.   The severity of the interference

The final factor to consider is "the severity of the interference with individual liberty." *Lidster*, 540 U.S. at 427 (quoting *Brown v. Tex.*, 443 U.S. at 51).  Thus, to pass constitutional muster, "the checkpoints must be minimally intrusive: (1) they must be clearly visible; (2) they must be part of some systematic procedure that strictly limits the discretionary authority of police officers; and (3) they must detain [riders] no longer than is

23

reasonably necessary to accomplish [their purpose] . . . unless other facts

come to light creating a reasonable suspicion of criminal activity."

*Bowman*, 496 F.3d at 692 (internal citations omitted).

In conducting this analysis, the court is guided by the Supreme

Court's comparison of checkpoint stops with roving patrol stops in

*Martinez-Fuerte*.  There, the Court stated:

> [W]e view checkpoint stops in a different light because the
> subjective intrusion—the generating of concern or even fright on
> the part of lawful travelers—is appreciably less in the case of a
> checkpoint stop . . . .  [T]he circumstances surrounding a
> checkpoint stop and search are far less intrusive than those
> attending a roving-patrol stop.  Roving patrols often operate at
> night on seldom-traveled roads, and their approach may frighten
> motorists.  At traffic checkpoints the motorist can see that other
> vehicles are being stopped, he can see visible signs of the
> officers' authority, and he is much less likely to be frightened or
> annoyed by the intrusion.

428 U.S. at 558 (internal citations and quotations omitted).

Here, plaintiffs concede the checkpoints—through the use of highway

variable message signs, or the presence of police personnel and

equipment—were visible.  (*See* Dkt. No. 61, Attach. 10 at 31:11-34:7,

Attach. 11 at 27:3-15, Attach. 12 at 34:3-11, Attach. 13 at 12:14-18.)  While

plaintiff Alpaugh claims he was surprised by, and apprehensive about

entering, the checkpoint, his claims are immaterial to the checkpoint's

24

visibility.  (*See* Dkt. No. 64, Attach. 1 at 41-42.)

Secondly, the officers' discretion at the checkpoints was appropriately limited.  In addition to publishing guidelines on checkpoint operations, and inspection "cheat sheets" to ensure uniformity, individual officer discretion was restricted in that all motorcyclists were subjected to a preliminary inspection in one of two ways: under Plan 1, by requiring all motorcycles to enter the checkpoints and undergo a brief inspection, or under Plan 2, through the use of the "point" officer.  (Defs.' SMF ¶¶ 61, 67-70.)

In spite of these facts, plaintiffs claim there were "no set standards for conducting the inspections," insofar as officers conducting the checkpoints retained discretion as to "who to inspect," "what the inspection should consist of," and "what to cite."  (*See* Dkt. No. 64, Attach. 1 at 43.)  This argument is unavailing because removing all discretion from the officer's conducting the checkpoints is unnecessary and impractical.  *See Prouse*, 440 U.S. at 661 (stating an officer's "standardless and unconstrained discretion . . . in the field [must] be circumscribed, at least to some extent."); *William*, 603 F.3d at 70 (finding the checkpoint in question there "constrained officers' discretion in the areas most important to the constitutional analysis: the checkpoint occurred at a fixed location, the

officers stopped every car passing through, and further investigation occurred only if individualized suspicion developed."); *cf. Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 760 (2005) (recognizing a "well established tradition of police discretion [which] has long coexisted with apparently mandatory arrest statutes.").

Here, defendants appropriately limited the officer's discretion as the motorcycle checkpoints occurred at fixed locations, every motorcycle was either stopped or initially inspected,[13] and "further investigation occurred only if individualized suspicion developed."  *See William*, 603 F.3d at 70.

Finally, there is no material dispute as to the third criterion, the reasonableness of the time plaintiffs were detained.  Though the plaintiffs dispute the methodology used by the State Police,[14] their depositions

---

[13]  Plaintiffs argue, and defendants admit, that some motorcycles were allowed to pass through the checkpoints without inspection.  (*See* Dkt. No. 64, Attach. 1 at 43.)  According to defendants, the checkpoints were temporarily shutdown (*i.e.,* all motorcycles were waived through) when the commanding officer determined checkpoint resources were overwhelmed and/or when safety considerations so required.  (*See* Dkt. No. 66 at 20.)  Although plaintiffs note that this authority was not explicitly discussed in the guidelines, safety was undoubtedly a prevailing concern.  (Defs.' SMF ¶¶ 61-64.)  Thus, to the extent plaintiffs are suggesting defendants should be required to forego safety considerations in order to eradicate all discretion, the court vehemently disagrees.

[14]  Irrespective of whether the defendants used Plan 1 or Plan 2 in conducting the checkpoints—a point plaintiffs belabored in their submissions—their utility far outweighs the minimal interference to the individuals detained.  Even if every rider was stopped for a brief inspection, as called for in Plan 1, this type of stop is indistinguishable from the checkpoints previously approved by the Supreme Court. *See, e.g., Martinez-Fuerte*, 428 U.S. at 566-67; *Sitz*, 496 U.S. at 455; *Lidster*, 540 U.S. at 423-28.  Moreover, Plan 2 was even less invasive given that motorcyclists, unlike automobile drivers, can be observed by simply slowing down

establish that, at most, they were detained for 45 minutes.   (*See* Dkt. No. 70 at 6; Pls.' SMF ¶¶ 20, 28; Defs.' SMF ¶¶ 91, 98, 112.)  Notably, this time reflects the entirety of the detention, and not just the preliminary inspection. Because the plaintiffs required secondary inspections—as they were suspected of, and eventually cited for, wearing illegal helmets—the court concludes the detentions in question were reasonably necessary to achieve the checkpoints' purpose.  (*See* Defs.' SMF ¶¶ 86-122.)

In sum, the court concludes the checkpoints were enacted to promote motorcycle safety, a manifest public interest; they were effective in addressing this interest; and that any interference with individual liberties was not only minimal, but also grossly outweighed by the interest advanced.  Since the checkpoints were reasonable under the Fourth Amendment, there was not a constitutional violation, and defendants are entitled to judgment as a matter of law.  Accordingly, defendants' motion for summary judgment is granted and plaintiffs' cross-motion is denied.

## B.   Defendants' Alternative Arguments

Alternatively, defendants argue that even if the checkpoints violated

---

and riding past a point officer.  (*See* Dkt. No. 61, Attach. 14 ¶ 37.)  Indeed, in cases where there was no visible or suspected violation, the rider did not even have to place his feet on the ground.  (*Id.*)  As such, the court concludes that both methodologies are constitutional.

plaintiffs' Fourth Amendment rights, they are still entitled to summary

judgment on the bases of Eleventh Amendment immunity, a lack of

personal involvement by defendant Swarts, and qualified immunity for all

defendants in their individual capacities.  (*See* Dkt. No. 61, Attach. 2 at 18-

19, 41-44.)  Though they failed to address the Eleventh Amendment

argument, plaintiffs counter, albeit in a cursory fashion, that genuine issues

of fact exist with respect to Swarts's personal involvement and qualified

immunity.  (*See generally* Dkt. No. 64, Attach. 1; Dkt. No. 70.)  The court

agrees with defendants.[15]

### 1.     Eleventh Amendment Immunity

Defendants correctly aver they are entitled to summary judgment on

the compensatory damage claims against them in their official capacities.

(*See* Dkt. No. 61, Attach. 2 at 41.) The Eleventh Amendment shields states

and their agencies, departments, and officials in their official capacities

from suit in federal court, regardless of the relief sought. *See Papasan v.*

*Allain*, 478 U.S. 265, 276 (1986). This immunity gives way in only three

circumstances: (1) where it is waived by the state; (2) where it has been

_____

[15]  While the court's decision rests firmly on the constitutionality of the checkpoints, the
following provides alternative bases for summary judgment.

abrogated by Congress, *see Kentucky v. Graham*, 473 U.S. 159, 169

(1985); and (3) where a state official is sued in her official capacity for

prospective injunctive relief, *see Ex parte Young*, 209 U.S. 123, 157

(1908).  *See also Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir.

1990) (explaining that section 1983 does not abrogate Eleventh

Amendment immunity).  Because plaintiffs' claims do not fall within any of

these recognized exceptions, Eleventh Amendment immunity provides an

alternative basis to grant defendants' motion with respect to the

compensatory damage claims against them in their official capacities.

### 2.    *Personal Involvement*

Next, defendants aver plaintiffs failed to prove Swarts was personally

involved in the alleged misconduct.  (*See* Dkt. No. 61, Attach. 2 at 18-19.)

In response, plaintiffs claim a factual issue exists as to whether Swarts, as

the chairman of the committee that funded the checkpoints, satisfies the

standard for personal involvement.  (*See* Dkt. No. 64, Attach. 1 at 36.)

However, this is not a question of fact.

Damages in a section 1983 claim are only appropriate if the

defendant was personally involved in the alleged constitutional violation.

*See Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (citations omitted).

Ordinarily, the plaintiff must demonstrate that there is a "tangible connection between the alleged unlawful conduct and the defendant." *Balkum v. Sawyer*, No. 6:06-cv-1467, 2011 WL 5041206, at *4 (N.D.N.Y. Oct. 21, 2011) (citing *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)). Where, as here, the defendant is a supervisory official, a link, under the doctrine of respondeat superior, is inadequate to establish the requisite personal involvement.  *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).  Thus, to prevail against a supervisory defendant, the plaintiff must show that the supervisor:

> (1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated.

*Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), *rev'd on other grounds*, *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).[16]

---

[16] Notably, the issue of supervisory liability for civil rights violations was addressed by the Supreme Court in *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009).  In that case, the Court clarified that a governmental official, regardless of title, is accountable only for his or her conduct in such a setting, and that as such the term "supervisory liability" is a misnomer.  *See*

In the instant case, Swarts's sole connection to the alleged

constitutional violation was that he chaired the committee responsible for

funding the checkpoints.  (*See* Dkt. No. 61, Attach. 2 at 19.)

Conspicuously absent from plaintiffs' submissions is proof that Swarts

participated in either the design or execution of the checkpoints, or that he

was responsible for assessing their constitutionality.  Moreover, plaintiffs

have not even articulated which of the five *Colon* prongs they are relying on

to establish personal involvement.

Accordingly, plaintiffs' inability to establish Swarts's personal

involvement in the alleged constitutional violation further supports the grant

of defendants' motion with respect to the claims against Swarts.

### 3.   *Qualified Immunity*

Lastly, defendants argue, and plaintiffs contest, that they are entitled

---

*Iqbal*, 129 S. Ct. at 1948.

The Second Circuit has yet to address the impact of *Iqbal* upon the categories of supervisory liability under *Colon*.  Lower courts have struggled with this issue, and specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See Sash v. United States*, 674 F. Supp. 2d 531, 543 (S.D.N.Y. 2009). While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.*, No.07 CIV. 1801, 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd*, 387 F. App'x 55 (2d Cir. 2010), others disagree and conclude that whether any of the five categories apply in any particular case depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010).  Nevertheless, the court, until instructed to the contrary, continues to apply the five factor *Colon* test.

to qualified immunity because: (1) plaintiffs' constitutional rights were not violated, and (2) even if a right was violated, the unlawfulness of the checkpoints was not apparent, and thus it was reasonable for them to believe no rights were violated.  (*See* Dkt. No. 61, Attach. 2 at 42-44.)  The court agrees with the defendants on both grounds.

Determining whether a government official is entitled to qualified immunity requires an answer to the following questions: (1) was a constitutionally protected right violated; and if so, (2) was that right "clearly established at the time of the defendant's alleged misconduct." *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011) (internal quotations and citations omitted).  Although their discretion was previously limited, courts may now conduct this inquiry in the order they deem appropriate.  *See id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 241 (2009)).  Accordingly, an official is shielded by qualified immunity if his conduct either did not infringe on a "clearly established constitutional right, or if it was objectively reasonable for [him] to believe his conduct did not violate such a right."  *Gilles v. Repicky*, 511 F.3d 239, 244 (2d Cir. 2007).

In deciding whether a right is "clearly established," the court considers three factors: (1) "was [it] defined with reasonable clarity," (2) has

32

the Supreme Court or Second Circuit confirmed its existence, and (3)

"would a reasonable defendant understand that his actions are unlawful."

*Doninger*, 642 F.3d at 345 (citing *Young v. Cnty. of Fulton*, 160 F.3d 899,

903 (2d Cir. 1998)).  Simply put, the conduct need not be previously

deemed unlawful, but the unlawfulness, in "light of pre-existing law . . .

must be apparent."  *Zeiper v. Metzinger*, 474 F.3d 60, 68 (2d Cir. 2007)

(quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

As discussed above, the execution of the motorcycle checkpoints did

not violate plaintiffs' constitutional rights.  However, presuming, without

deciding, that a right was violated, the issue here is not whether that right

was clearly established—as rights protected by the Fourth Amendment are

well settled—but whether defendants reasonably believed their conduct

was lawful.  The court concludes that it was.

For over thirty years, the Supreme Court, with limited exceptions, has

affirmed the constitutionality of nearly indistinguishable checkpoints.  It

follows that defendants reasonably believed that their conduct was lawful,

and thus, are entitled to qualified immunity for all claims against them in

their individual capacities.

## C.   Plaintiffs' Motion for Class Certification

33

In their cross-motion for summary judgment, plaintiffs seek an order determining that the action be maintained as a class action under Fed. R. Civ. P. 23(b).  (*See* Dkt. No. 64.)  In light of the court's decision, the motion is denied as moot.

## V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 61) is **GRANTED**; and it is further

**ORDERED** that plaintiffs' cross-motion for summary judgment and class certification (Dkt. No. 64) is **DENIED**; and it is further

**ORDERED** that all claims against defendants are **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

November 17, 2011
Albany, New York

Gary L. Sharpe
U.S. District Judge